# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 25-3205

———————————————

United HealthCare Services, Inc.

*Plaintiff - Appellant*

v.

AmerisourceBergen Corporation; AmerisourceBergen Drug Corp.;
AmerisourceBergen Specialty Group, LLC; ASD Specialty Healthcare, LLC,
doing business as Oncology Supply Company; Medical Initiatives, Inc., doing
business as Oncology Supply Pharmacy Services

*Defendants - Appellees*

———————

Appeal from United States District Court
for the District of Minnesota

———————

Submitted: May 14, 2026
Filed: July 31, 2026

———————

Before L.R. SMITH, BENTON, and STRAS, Circuit Judges.

———————

L.R. SMITH, Circuit Judge.

United Healthcare Services, Inc. (UHS) filed suit against AmerisourceBergen Corporation (AmerisourceBergen) and related companies[1] (collectively, "Amerisource defendants"), alleging that the Amerisource defendants perpetrated an unlawful scheme to distribute and sell doses of adulterated oncology drugs. UHS alleged that these drugs were administered to patients in Minnesota and nationwide, including patients insured under programs that UHS operated. UHS brought claims for common-law fraud and unjust enrichment, as well as claims alleging violations of various Minnesota statutes. Amerisource moved to dismiss all claims. The district court[2] dismissed the complaint on several grounds, including that it was untimely. UHS now appeals. We affirm the district court's dismissal of UHS's complaint because it was untimely and thus barred by the applicable statute of limitations.

## I. *Background*

UHS, a Minnesota corporation, administers commercial insurance and managed-care programs on behalf of its subsidiaries and affiliates. AmerisourceBergen, a Delaware corporation, is a pharmaceutical sourcing and distribution company. It has a pharmaceutical distribution segment that includes multiple subsidiaries.[3] Notably, AmerisourceBergen acquired MII in 2001.

---

[1]AmerisourceBergen Drug Corp. (ABC Drug); AmerisourceBergen Specialty Group, LLC (ABC Specialty); ASD Specialty Healthcare, LLC, doing business as Oncology Supply Company (Oncology Supply); and Medical Initiatives, Inc., doing business as Oncology Supply Pharmacy Services (MII).

[2]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

[3]These include ABC Drug and ABC Specialty. ABC Drug is a nationwide wholesale supplier of pharmaceuticals, including injectable products. ABC Specialty provides oncology-distribution services to healthcare providers nationwide. Oncology Supply, formerly a division or subsidiary of ABC Specialty, was a pharmaceutical wholesaler; it is no longer in business. MII, a Florida corporation, operated out of Oncology Supply's Alabama facility.

UHS alleges that between 2001 and 2014, the Amerisource defendants "perpetrated" "an unlawful scheme . . . to distribute and sell millions of doses of adulterated oncology drugs to be administered to cancer patients in Minnesota and nationwide, many of which were insured under commercial and government insurance programs operated by UHS." R. Doc. 77 ¶ 1. The unlawful scheme, "known as the Pre-Filled Syringe Scheme," involved the Amerisource defendants unlawfully repackaging drugs for resale. *Id.* ¶ 2. The scheme operated as follows: Oncology Supply purchased single-use and multi-use glass vials of oncology drugs that the Food and Drug Administration (FDA) had approved. Product manufacturers delivered the oncology medication vials to Oncology Supply in sealed FDA-approved packaging. Each vial contained an "overfill" amount "to account for human error or spillage in filling syringes." *Id.* ¶ 59; *see also id.* ¶ 15. Overfill is not intended for patient use and must be discarded; "[i]t cannot be bought or sold independent from its original vial." *Id.* ¶ 60.

According to UHS's complaint, after receiving the vials from product manufacturers, Oncology Supply sent the drugs to MII. MII was not a pharmacy and was never registered as a manufacturer or re-packager of prescription medicine with the FDA. MII took the overfill vials and then "broke the vials' sterile seals, pooled together medicine from numerous vials, and created pre-filled syringes ('PFS') of the drugs to be sold down the supply chain." *Id.* ¶ 6; *see also id.* ¶ 61. "This was illegal." *Id.* ¶ 61. Thereafter, ABC Specialty sold or distributed the PFS to healthcare providers. UHS then reimbursed claims filed by providers or patients for syringes administered to individuals insured by UHS. UHS acknowledges that the Amerisource "[d]efendants did not themselves submit claims for payment to government healthcare programs or insurers." *Id.* ¶ 269.

UHS alleges that the Amerisource defendants engaged in this scheme knowing that UHS "would ultimately pay for a substantial number of the adulterated oncology drugs" because "[m]any of the cancer patients who received PFS were insured by UHS's health plan subsidiaries and affiliates . . . and UHS paid for their treatment accordingly." *Id.* ¶ 10. UHS did not know that "[t]he PFS were adulterated,

dangerous, tainted, effectively worthless, and had no market value." *Id.* In addition, UHS alleges that "[t]he PFS scheme breached basic safety standards," including those promulgated by the FDA and Centers for Disease Control and Prevention (CDC). *Id.* ¶ 8. According to UHS, the Amerisource "[d]efendants made or caused to be made material misstatements or omissions continuously between approximately 2001 and 2014" on "product labels . . . , National Drug Codes, packaging, invoices, promotional statements, website material, publications, and . . . within information conveyed to providers who sought reimbursement for Oncology Drugs from UHS." *Id.* ¶ 280.

Prior to UHS's suit, the PFS scheme was the subject of other civil actions and government investigations. "On October 21, 2010, a *qui tam* action was filed under seal in the United States District Court for the Eastern District of New York . . . ." *Id.* ¶ 223 (citing 31 U.S.C. § 3730(b)). In that action, Michael Mullen, the Chief Operating Officer of ABC Specialty, alleged that "[w]ithin mere months of taking the COO helm" in "late 2009," "he identified significant compliance failures with ABC Specialty's oncology business, including Oncology Supply and MII." *Id.* ¶ 224. In 2010, AmerisourceBergen disclosed this *qui tam* action in its publicly filed Securities and Exchange Commission (SEC) annual report for the fiscal year ending September 30, 2010. *See* R. Doc. 30-2, at 3.[4]

In 2012, AmerisourceBergen disclosed in its SEC annual report for the fiscal year ending September 30, 2012, that the Dothan, Alabama facility—where MII and Oncology Supply were located—was the subject of a related government investigation. In that report, AmerisourceBergen disclosed that it had "received a subpoena from the USAO[5] requesting production of documents and information relating to . . . Oncology Supply distribution center and pharmacy in Dothan,

---

[4]The district court took judicial notice of the Amerisource defendants' SEC disclosures. *See* R. Doc. 56, at 4 n.3. UHS has not challenged that decision on appeal.

[5]United States Attorney's Office for the Eastern District of New York.

Alabama, which the Company believes could be related to a qui tam action that remains under seal." R. Doc. 30-3, at 3. That investigation had been covered in the news media earlier that year. *See* R. Doc. 30-8.[6] On August 9, 2012, the *Wall Street Journal* had reported that "[o]n July 11, [2012], investigators with the inspector general for the Department of Health and Human Services and the U.S. Food and Drug Administration served a search warrant at the Dothan site." *Id.* at 3. In the fall of 2012, a *Fortune* magazine journalist investigated the search warrant at Dothan. AmerisourceBergen stifled the story by threatening the reporter, magazine editor, and *Fortune* magazine's corporate parent. *See* R. Doc. 77 ¶¶ 228, 230, 344, 346.

In its 2014, 2015, and 2016 SEC annual reports, AmerisourceBergen continued to publicly disclose that the Dothan facility was under federal investigation.[7] The 2016 SEC annual report noted that the USAO had "expressed an

---

[6]The district court also took "judicial notice of news reports to the extent that a report demonstrates that certain information was publicly available at a certain time." R. Doc. 56, at 4 n.4. UHS has not challenged that decision on appeal.

[7]*See* R. Doc. 30-5, at 3 ("The Company and AmerisourceBergen Specialty Group ('ABSG') have also received subpoenas from . . . USAO[] requesting production of documents and information relating to ABSG's oncology distribution center and former pharmacy in Dothan, Alabama, its group purchasing organization for oncologists, and intercompany transfers of certain oncology products, which the Company believes could be related to one or more of the qui tam actions that remain under seal."); R. Doc. 30-6, at 3 ("Since fiscal 2012, the Company and . . . ABSG[] have been responding to subpoenas from the [USAO] requesting production of documents and information relating to ABSG's oncology distribution center and former pharmacy in Dothan, Alabama (*including the practices and procedures of the former pharmacy's pre-filled syringe program*), its group purchasing organization for oncologists, and intercompany transfers of certain oncology products, which the Company believes could be related in whole or in part to one or more of the qui tam actions that remain under seal. The Company continues to engage in dialogue with the [USAO] . . . ." (emphasis added)); R. Doc. 30-7, at 3 ("Since fiscal 2012, . . . AmerisourceBergen . . . ha[s] been responding to subpoenas . . . requesting production of documents and information relating to ABSG's oncology distribution center and former pharmacy in Dothan, Alabama (*including the practices and procedures of the former pharmacy's pre-filled syringe program*),

intention to pursue potential civil and criminal charges based upon the FDCA[8] and the False Claims Act [(FCA)]." R. Doc. 30-7, at 3–4.

Then on September 27, 2017, the Department of Justice (DOJ) "charg[ed] ABC Specialty with the introduction of misbranded drugs into interstate commerce." R. Doc. 77, at ¶ 249. That same day, "ABC Specialty pleaded guilty to violating the FDCA. In the plea agreement, it admitted to operating the PFS Scheme, and that MII 'opened sterile vials, pooled the drug product from the vials, and then transferred the drug product into smaller [pre-filled syringes].'" *Id.* ¶ 254 (alteration in original) (quoting Plea Agreement at 21, *United States v. AmerisourceBergen Specialty Group, LLC*, No. 17-CR-00507 (E.D.N.Y. Sept. 27, 2017), Dkt. No. 10). As part of the plea, ABC Specialty agreed to pay a criminal fine of $208 million and a criminal forfeiture of $52 million. The DOJ disclosed the information, plea, and settlement in a press release posted on its website.

In 2018, the Amerisource defendants also entered a civil settlement with the United States in the *qui tam* FCA action that was first disclosed in 2010 and two related *qui tam* FCA actions. The Amerisource defendants "agree[d] to pay $625 million in civil liability under the [FCA] for repackaging and distributing [o]ncology [d]rugs through the PFS [s]cheme, which were not approved for sale or human use by the FDA." *Id.* ¶ 257. In the settlement agreement, the Amerisource defendants

> admitted that between January 2001 and January 2014, Medical Initiatives and Oncology Supply Company operated a program that created, packed and shipped millions of PFS to oncology practices for administration to vulnerable cancer patients (the PFS Program). At Medical Initiatives, an ABC subsidiary located in Alabama, the drug product was removed from the original glass vials and multiple vials of the product were pooled in untested plastic containers. Then the drug,

---

its group purchasing organization for oncologists, and intercompany transfers of certain oncology products . . . ." (emphasis added)).

[8]Food, Drug, and Cosmetic Act.

including the overfill, was extracted and repackaged into syringes. By harvesting the overfill, ABC was able to create more doses than it bought from the original vial manufacturers and avoid opening some of the vials. ABC retained the unopened vials and sold them to other customers and to its subsidiary ABC Drug Company for resale. During the 13 years the PFS Program was in operation, Medical Initiatives manufactured thousands of syringes daily, and eventually over one million syringes per year. These syringes were sold throughout the United States . . . .

*Id.*

Approximately five years later, UHS filed the present action on September 19, 2023. UHS pleaded that all relevant conduct occurred between "approximately 2001 and 2014." R. Doc. 1 ¶¶ 2, 33, 46, 156, 205. Earlier that year, on January 8, 2023, the parties had entered into an agreement tolling the statute of limitations for 240 days. UHS brought claims for common-law fraud, unjust enrichment, and deceptive business practices, in violation of Minn. Stat. § 325F.71, as well as claims under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69; and the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13. The Amerisource defendants moved to dismiss all claims. The statute of limitations for all claims was six years. *See* Minn. Stat. § 541.05(1), (2), (6). Six years prior to the suit, including the 240-day tolling agreement, was January 22, 2017.

The district court granted the Amerisource defendants' dismissal motion. It concluded that UHS's claims were time-barred for two primary reasons:

> (1) that information contained in several SEC filings and a media story . . . triggered the statute of limitations on [UHS]'s claims and ended tolling; and (2) that [UHS] failed to plead with sufficient particularity that [the Amerisource] [d]efendants engaged in fraudulent concealment and that [UHS] could not have diligently discovered its claims before January 22, 2017.

R. Doc. 76, at 3.

-7-

UHS moved for relief from judgment. It argued that the district court should permit it to amend its complaint to add allegations regarding tolling and to cure any pleading deficiencies in the original complaint. The court granted UHS's motion. It concluded that UHS's proposed amended complaint "plausibly raise[d] the existence of factual disputes related to the timeliness of its claims." *Id.* at 8. The court vacated the judgment and allowed UHS to file an amended complaint to address pleading deficiencies.

UHS amended its complaint and added a claim under the Minnesota Unfair and Deceptive Trade Practices Act, Minn. Stat. § 325D.44. After UHS filed its amended complaint, the Amerisource defendants again moved to dismiss the complaint. They asserted that UHS's claims were time-barred and that UHS failed to state a claim on the merits. The district court granted the second dismissal motion. In relevant part, it determined that all claims were time-barred because UHS "could have, with reasonable diligence, filed this lawsuit before January 22, 2017." R. Doc. 95, at 5. UHS failed to cure the untimeliness of their claims in the amended complaint. The court noted a contradiction in UHS's contentions. UHS alleged "that it lacked knowledge of any public disclosure about the PFS Program before November 2016, and that [it] could not have discovered the fraud, despite public disclosures beginning in 2012, until after November 2016." *Id.* at 22. But UHS also alleged "that it relied on statements made by [the Amerisource] [d]efendants well before 2016 in support of its fraud claims." *Id.* These inconsistent assertions supported the district court's conclusion that UHS failed to sufficiently plead any fraudulent concealment to toll the statute of limitations.

## II. *Discussion*

On appeal, UHS argues that the district court erroneously dismissed its claims as time-barred.[9] It maintains that the district court committed "three errors" by concluding that the Amerisource defendants' SEC filings "triggered the statute of

---

[9]UHS also argues that the district court erred in dismissing its claims based on its alleged failure to sufficiently plead their elements. We need not address this argument because we conclude that all claims are time-barred.

limitations." Appellant's Br. 43. First, it argues that the district court improperly "imputed constructive knowledge of the [SEC] filings [to] UHS." *Id.* Second, it asserts that the district court erroneously concluded that the filings provided "sufficient information to put UHS on notice of its claims." *Id.* And third, it maintains that the district court erred by holding that UHS failed to "'adequately allege that [it] could not have discovered any alleged concealment with reasonable diligence' within the relevant time period." *Id.* (alteration in original) (quoting R. Doc. 95, at 23).

We "review[] de novo a 12(b)(6) dismissal." *Geivett v. AMC Mgmt., LLC*, 158 F.4th 900, 903 (8th Cir. 2025) (per curiam) (quoting *Ringhofer v. Mayo Clinic*, 102 F.4th 894, 898 (8th Cir. 2024)). "Courts may dismiss claims under 12(b)(6) as barred by the statute of limitation if the complaint itself shows that the claim is time-barred." *Id.* (citation modified).

Minnesota law applies a six-year statute of limitations for, among others, actions

> (1) upon a contract or *other obligation*, *express or implied*, as to which no other limitation is expressly prescribed;
>
> (2) upon a *liability created by statute*, other than those arising upon a penalty or forfeiture or where a shorter period is provided by section 541.07;
>
> .   .   .
>
> (6) for relief on the ground of fraud, in which case the cause of action shall not be deemed to have accrued *until the discovery by the aggrieved party of the facts constituting the fraud* . . . .

Minn. Stat. § 541.05, subd. 1 (emphases added).

There is no dispute that a six-year statute of limitations applies to all of UHS's claims; the question is *when* this six-year statute of limitations began to run for each of the claims. We hold that the statute of limitations for all claims began to run no later than 2016. UHS did not file its suit until 2023, after the six-year-statute of limitations expired. Accordingly, UHS's claims are time-barred.

### A. *Common-Law Fraud Claims*

A six-year statute of limitations applies to common-law fraud claims in Minnesota. *In re Hernandez*, 860 F.3d 591, 600 (8th Cir. 2017) (quoting Minn. Stat. § 541.05, subd. 1(6)). The plaintiff must "allege and prove that he did not discover the facts constituting the fraud until within six years before the commencement of the action." *Blegen v. Monarch Life Ins. Co.*, 365 N.W.2d 356, 357 (Minn. Ct. App. 1985) (quoting *Duxbury v. Boice*, 72 N.W. 838, 839 (Minn. 1897)). "A plaintiff's due diligence in the statute of limitations context is ordinarily a question of fact. Where the evidence leaves no room for reasonable minds to differ on the issue, however, the court may properly resolve the issue as a matter of law." *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684–85 (Minn. Ct. App. 2010) (citation modified).

"A plaintiff must exercise reasonable diligence when he or she has *notice of a possible cause of action for fraud*." *Hernandez*, 860 F.3d at 601 (quoting *Buller v. A.O. Smith Harvestore Prods., Inc.*, 518 N.W.2d 537, 542 (Minn. 1994)). "The requirement of reasonable diligence imposes an affirmative duty to investigate upon a party who is aware of facts that might constitute a possible cause of action for fraud." *Jane Doe 43C*, 787 N.W.2d at 685 (citation modified). This means that

> [t]he facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, they could and ought to have been discovered. The mere fact that the aggrieved party did not actually discover the fraud will not extend the statutory limitation, if it appears that the failure sooner to discover it was the result of negligence, and inconsistent with reasonable diligence.

*Hernandez*, 860 F.3d at 600 (quoting *Bustad v. Bustad*, 116 N.W.2d 552, 555 (Minn. 1962)).

The reasonable-diligence principle is reflected in "instances where the plaintiff possessed information putting him on notice of fraud." *Id.*[10] There must be "evidence in the record that [the plaintiff] should have been on notice that [the defendant] was possibly committing fraud." *Hernandez*, 860 F.3d at 601. "But a party is under no duty to investigate a fraud it has no reason to suspect. Thus, the proper inquiry is whether and when appellants had reason to suspect fraud on respondents' part, which suspicion would trigger appellants' duty to investigate the claim." *Jane Doe 43C*, 787 N.W.2d at 685 (citation modified).

We conclude that the Amerisource defendants' judicially noticed disclosures, along with the allegations contained in the amended complaint, establish that UHS should have been on notice of the Amerisource defendants' fraud no later than 2016. By that date, the Amerisource defendants "had publicly disclosed details about the federal investigation into the PFS, including the potential for civil and criminal

---

[10]*See, e.g.*, *First Nat'l Bank of Shakopee v. Strait*, 73 N.W. 645, 646 (Minn. 1898) (concerning a bank note that the plaintiff bank alleged had been fraudulently marked as paid, even though the note had been listed in the bank's accounts receivable more than six years before the suit); *Bustad*, 116 N.W.2d at 554 (concerning a claim that the defendant had fraudulently represented that payment was forthcoming, but the defendant had more than six years earlier refused to sign a waiver of the limitations period for a claim on the payment); *Blegen*, 365 N.W.2d at 357–58 (involving plaintiff who was informed seven years prior to the action that the terms of his company's pension plan were different than what an agent for the pension company had represented to him); *Buller*, 518 N.W.2d at 542 (involving a farmer who observed spoiled feed in a silo more than six years prior to his claim against the silo dealer for fraudulent representations about the silo's ability to prevent spoilage); *Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 675–76 (D. Minn. 1993) (finding that the plaintiffs "knew almost from the start that the promised benefits which induced them to purchase the [defendant's] silos did not materialize" and that, therefore, a duty to investigate was triggered when the problems plaintiffs experienced were attributed to the silos by the plaintiffs' veterinarians).

liability. So UHS knew—or by reasonable diligence should have discovered—its cause of action more than six years before it filed suit." Appellees' Br. 26. First, prior to the SEC disclosures, the *Wall Street Journal* had reported that federal investigators served a search warrant at the Dothan facility. Then, in its 2012 annual SEC report, AmerisourceBergen disclosed that the Dothan facility—where MII and Oncology Supply were located—was under federal investigation and that it had received a subpoena for documents concerning that facility. AmerisourceBergen's belief was that the federal investigation was related to the sealed *qui tam* action.

Second, although AmerisourceBergen "bullied and threatened a [*Fortune* magazine] journalist," R. Doc. 77 ¶ 228, not to do an exposé on the MII near the disclosure of its 2012 SEC annual report, its 2014 and 2015 SEC annual reports continued to publicly disclose the federal investigation at its Dothan facility. For example, the 2015 SEC annual report disclosed that since 2012, federal investigators had requested "production of documents and information relating to ABSG's oncology distribution center and former pharmacy in Dothan, Alabama (*including the practices and procedures of the former pharmacy's pre-filled syringe program*), its group purchasing organization for oncologists, and intercompany transfers of certain oncology products." R. Doc. 30-6, at 3 (emphasis added).

Finally, AmerisourceBergen reiterated these detailed disclosures in its 2016 SEC annual report. *See* R. Doc. 30-7, at 3. That report added that the USAO "ha[d] expressed an intention to pursue potential civil and criminal charges based upon the FDCA and the False Claims Act." *Id.* at 3–4.

As the district court correctly concluded, these "repeated disclosures revealed a basis for UHS to investigate [the Amerisource defendants'] conduct." R. Doc. 56, at 14. "[W]ith reasonable diligence, the alleged fraud could have and ought to have been discovered by UHS." *Id.*

UHS challenges this conclusion. It relies on cases from other jurisdictions determining that similar disclosures were insufficient to put the plaintiff on notice

that its rights were being violated.[11] Among those, the most factually similar case is *GlaxoSmithKline*. That case involved private health insurance companies' claims against a drug manufacturer, brought in 2013. 2016 WL 6612804, at *1. The plaintiffs alleged that they purchased drugs based on the drug manufacturer's misrepresentations that the drugs were manufactured in accordance with federal safety and quality practices. *Id.* The drugs, however, were adulterated. *Id.* The defendant drug manufacturer responded that Pennsylvania's discovery rule did not toll the two- or four-year statute of limitations on the plaintiff's claims because the plaintiffs knew or should have known of their claims by early 2003, and certainly by early 2005. *Id.* at *8–9. It argued that publicly available information—including the defendant's annual reports—disclosed FDA enforcement actions and "current Good Manufacturing Practices" (cGMP) issues at the manufacturing plant. *Id.* at *9.

---

[11]*See, e.g.*, *Est. of Pepper ex rel. Deeble v. Whitehead*, 686 F.3d 658, 667 (8th Cir. 2012) ("Defendants argue that Gary's Memphis newspaper obituary demonstrates John Tate's knowledge of the collection's existence at the time of Gary's death. As recounted earlier, however, Tate denied being interviewed by the newspaper or making the quotes attributed to him. Even had he made the quotes attributed to him, the only statement in the obituary regarding the collection neither quoted nor was otherwise attributed to him, and he denied ever reading the obituary prior to this litigation. In addition, the types of memorabilia described in the obituary share similarities with the memorabilia brought by Gary to California. Thus, a genuine issue of material fact exists concerning Tate's pre–2009 knowledge of the collection's existence."); *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944 & n.5 (8th Cir. 2007) (holding that under the federal-question discovery rule, prior published case involving lawsuit pursuant to the Cable Communications Policy Act brought by cable television service provider against a seller of cable descrambler devices was insufficient to put plaintiff cable service provider on notice that its rights under the Act were being violated by seller of descrambler devices, and thus, limitations period for plaintiff's suit against seller for violation of the Act did not commence on date that decision in prior case was issued; although plaintiff later purchased the provider involved in the prior lawsuit, the suit did not mention plaintiff or apply in any way to plaintiff); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2016 WL 6612804, at *8–11 & nn. 17, 19 (E.D. Pa. Nov. 9, 2016) (holding that insurers would not be imputed with notice of drug manufacturer's annual reports).

The court disagreed, concluding that "[f]actual issues remain as to whether the public disclosures of cGMP issues between 2002 and 2005 constituted 'storm warnings' establishing inquiry notice, especially in light of [the drug manufacturer's] attempts to minimize the extent of the cGMP violations, the violations' effect on the quality and safety of the drugs produced at [the facility], and the FDA's involvement." *Id.* In relevant part, the drug manufacturer "downplay[ed] the extent of its issues and assure[d] the public of its compliance with FDA demands," by representing in its annual reports that it had "voluntarily recalled certain shipments," "was able to resolve the issue of the drug recalls quickly because of its strong relationship with the F.D.A.," and "ha[d] been advised by the FDA that the Group's response to the inspectional observations is satisfactory." *Id.* at *10 (citation modified).

Unlike in *GlaxoSmithKline*, UHS's amended complaint contains no allegations that the Amerisource defendants "actively contradicted and downplayed public information." Appellees' Br. 62. Instead, the judicially noticed SEC annual reports show that the Amerisource defendants "affirmatively disclosed details." *Id.* These details placed UHS on notice of its claims against the Amerisource defendants. Accordingly, UHS's common-law fraud claims are barred by the statute of limitations.

B. *Statutory Fraud Claims and Unjust Enrichment Claims*

In addition to UHS's common-law fraud claim, UHS has raised four statutory claims. *See* Minn. Stat. § 325F.69; Minn. Stat. § 325D.13; Minn. Stat. § 325F.71; Minn. Stat. § 325D.44. We have previously held that "[t]hese statutory claims are governed by the . . . six-year statute of limitations" in § 541.05, subd. 1(2). *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (8th Cir. 2004). UHS has not disputed that § 541.05, subd. 1(2) applies to its statutory fraud claims.[12]

_____

[12]The Minnesota Supreme Court's subsequent decision in *Finn v. Alliance Bank* calls into doubt our holding in *Tuttle* that subsection 2—as opposed to subsection 6—applies to statutory fraud claims. 860 N.W.2d 638, 656–57 (Minn. 2015) (Stras, J.) (holding that § 541.04, subd.1(6)'s fraud provision—as opposed to

-14-

Section 541.05, subd. 1(2) "does not include a discovery allowance as does the statute of limitations applicable to fraud claims." *Tuttle*, 377 F.3d at 926 (citation modified); *see also Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) ("The statute of limitations, Minn. Stat. Anot. § 541.05, is not tolled by the failure of a party to discover an alleged mistake upon which a contract action is based." (quoting *Sollar v. Oliver Iron Mining Co.*, 54 N.W.2d 114, 117 (Minn. 1952))). This means that "the six-year limitations period commence[s] . . . when the alleged violations of these consumer statutes occurred." *Tuttle*, 377 F.3d at 926.

Similarly, UHS's unjust enrichment claim is subject to the six-year statute of limitations set forth in Minn. Stat. § 541.05, subdiv. 1(1) (prescribing a six-year statute of limitations for an action "upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed"). Like subsection 2, "[t]he statute of limitations [in subsection 1] is not tolled by the failure of a party to discover" an alleged action. *Block*, 428 N.W.2d at 854 (quoting *Sollar*, 54 N.W.2d at 117).

According to UHS's amended complaint, the Amerisource defendants made material misrepresentations beginning in 2001. *See, e.g.*, R. Doc. 77 ¶ 159. But UHS did not file its suit until 2023, well outside the statute-of-limitations period. UHS asserts, however, that the doctrine of fraudulent concealment tolls the statute of limitations for its statutory and unjust enrichment claims. According to UHS, the Amerisource defendants "suppressed the truth by lying to regulators, providers, and the media; quashing a planned news exposé into the PFS program by a national magazine; putting out a false rebuttal of a news article; and falsifying packaging, billing, and pedigree records" despite knowing that third party insurers were being billed fraudulently. Appellant's Br. 20. It maintains that the district court erred by holding that fraudulent concealment required a direct statement from the Amerisource defendants to UHS.

---

§ 541.05, subd. 1(2)'s statutory provision—applied to actual-fraud claims under the Minnesota Uniform Fraudulent Transfer Act). Even if we were to apply subsection 6, the result would be the same. *See supra* Part II.A.

"Fraudulent concealment is an equitable doctrine. We typically review a district court's decision as to whether to grant equitable relief for an abuse of discretion." *Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 513 (Minn. 2014) (citation modified). To establish a claim for fraudulent concealment, the "plaintiff must plead" and prove three elements: (1) the defendant made "an affirmative act or statement which concealed a potential cause of action"; (2) the defendant knew the statement was "false or was made in reckless disregard of its truth or falsity"; and (3) *the plaintiff "could not have . . . discovered [the concealment] by reasonable diligence*." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 786 (8th Cir. 2009) (emphasis added) (quoting *Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992)). When no fiduciary relationship exists "between the parties, 'there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action.'" *Id.* (quoting *Wild v. Rarig*, 234 N.W.2d 775, 795 (Minn. 1975)).

Fraudulent concealment "achieve[s] the result in nonfraud cases that the 'discovery rule' achieves in fraud cases." *Kopperud v. Agers*, 312 N.W.2d 443, 446 (Minn. 1981). The Minnesota Supreme Court has explained that "[t]he theoretical difference is that when the suit is for fraud, the statute does not begin to run until discovery, but when the suit is for another claim, the statute begins to run from the wrong but is tolled by defendant's fraudulent conduct." *Id.* at 446–47.

For the reasons set forth *supra* regarding UHS's common-law claims, the amended complaint, in conjunction with the judicially noticed documents, demonstrates that UHS cannot satisfy the third element of fraudulent concealment. Considering publicly available information, UHS has not plausibly pleaded that it could not have discovered the concealment. *See supra* Part II.A. As a result, UHS's statutory fraud claims and unjust enrichment claim are barred by the statute of limitations.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____